UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL L. CAREY,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )    No.  4:11CV212 FRB
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
                Defendant.           )

## MEMORANDUM AND ORDER

This cause is before the Court on appeal of an adverse ruling of the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.  Procedural History

On December 21, 2007, plaintiff Michael L. Carey filed an application for Supplemental Security Income pursuant to Title XVI, 42 U.S.C. §§ 1381, et seq., in which he claimed he became disabled on September 25, 2007.  (Tr. 128-33.)  Plaintiff subsequently amended his alleged onset date to November 30, 2007.  (Tr. 146.)  On initial consideration, the Social Security Administration denied plaintiff's claim for benefits.  (Tr. 79, 85-89.)  On October 1, 2009, a hearing was held before an Administrative Law Judge (ALJ) at which plaintiff testified and was represented by counsel.  A vocational expert also testified at the hearing. (Tr. 19-78.)  On October 28, 2009, the ALJ issued a decision denying plaintiff's

claim for benefits. (Tr. 6-18.) On December 17, 2010, after consideration of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on October 1, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that he is married and lives in an apartment with his spouse. Plaintiff has no children. Plaintiff stands five feet, eight inches tall and weighs 225 pounds. Plaintiff testified that he left high school in the tenth grade and subsequently received vocational training in cement masonry. Plaintiff never obtained his GED. (Tr. 26-29.) Plaintiff receives food stamps. Plaintiff also receives rent assistance through a program sponsored by BJC. (Tr. 36.)

Plaintiff's Work History Report shows plaintiff to have worked as a hospital janitor in 1994. Plaintiff testified that his employment as a janitor was terminated because he arrived late to work a few times. Plaintiff testified that he was late for his bus on occasion and could not follow the bus schedule. In 2001, plaintiff worked as a clerk at a fast food restaurant. In 2001 and 2002, plaintiff worked cleaning mass transit buses at a bus

station.  From January 2001 to April 2003, plaintiff worked loading and unloading trucks for a rental company.  Plaintiff testified that he also worked for short periods of time at factories but could not perform the work because he could not focus.  (Tr. 37-39, 42-43, 66, 187, 198-99.)

Plaintiff testified that he was incarcerated for a period of years on drug and burglary offenses.  (Tr. 33-36.)  Plaintiff testified that he did not work from 1991 to 1993 because of his incarceration.  (Tr. 41.)  Plaintiff testified that he tried to work while in prison but was unable to do so because of his diabetes.  Plaintiff testified that he attempted to attend classes while in prison in order to obtain his GED but was unsuccessful because of his inability to focus.  (Tr. 48-49.)

Plaintiff testified that he has memory problems and cannot work because he has difficulty with focusing and following directions.  (Tr. 44.)  Plaintiff testified that he was diagnosed with bipolar disorder in 2000 or 2001 and experiences mood swings, depression, stress, and nervousness.  (Tr. 47, 49, 65.)  Plaintiff testified that he sees a psychiatrist and takes medication for the condition.  (Tr. 47.)  Plaintiff testified that he also saw a psychiatrist while he was incarcerated and took Depakote at that time.  (Tr. 48.)

Plaintiff testified that he hears voices, including his grandfather's, which sometimes tell him to kill himself.  Plaintiff

testified that he had previously thought of suicide a couple of times but that prayer and talking with his mother helped him through the episodes. (Tr. 50.)

Plaintiff testified that he was in special education classes until the sixth grade and took Ritalin as a child, beginning when he was four or five years of age. (Tr. 47, 63.) Plaintiff testified that he has difficulty reading and must sometimes ask for help with words when reading his Bible. (Tr. 29-31.) Plaintiff testified that he does not read a newspaper and only watches or listens to the news. Plaintiff testified that he can read road signs. Plaintiff testified that he can perform simple arithmetic such as addition and subtraction and some multiplication, but he cannot perform more complex math functions. (Tr. 31-33.)

Plaintiff testified that he also has diabetes and is insulin dependent. Plaintiff testified that he mostly administers the insulin injections, but that his wife measures the medication in the syringe for him because he has difficulty measuring it accurately. (Tr. 44-46, 67-68.) Plaintiff testified that, in addition to insulin, his current medications include Depakote, Seroquel, Wellbutrin, and Risperdal. Plaintiff testified that he also takes medication for high blood pressure and for sleep problems. Plaintiff testified that he has difficulty sleeping and wakes throughout the night. Plaintiff testified that his doctor

informed him that one of his medications makes him eat a lot. (Tr. 52-53.)

Plaintiff testified that he previously used alcohol and illicit drugs but has not done so since 2006 or 2007. Plaintiff testified that he attends a spiritual narcotics/alcoholics anonymous group. (Tr. 56-57.)

Plaintiff testified that his mother, wife or case worker attend appointments with him because he may get lost or be late if he is alone. Plaintiff testified that he gets confused on the streets. Plaintiff testified that his wife and mother maintain his calendar and review his mail for important documents or letters. (Tr. 62-63.) Plaintiff testified that he can tell time but depends on his wife to keep track of appointments for him. (Tr. 66-67.) Plaintiff testified that he talks with his case worker at least twice a week and that she gives him reminders, such as when to pay rent, when his appointments are scheduled, and when to pick up prescriptions. (Tr. 64-65.)

As to his exertional abilities, plaintiff testified that he is able to walk, stand and sit. Plaintiff testified that he is limited to lifting forty to fifty pounds because of pain in his back and hip. Plaintiff testified that he is also limited in his ability to bend or squat for long periods of time because of the pain. Plaintiff testified that he takes Extra Strength Tylenol for the pain. (Tr. 58-59, 69.)

As to his daily activities, plaintiff testified that he attends an adult day care facility three or four days a week where he participates in field trips and is involved in making arts and crafts. Plaintiff testified that he eats breakfast and lunch at the facility, and watches movies and television. Plaintiff testified that he has a lot of friends at the facility. (Tr. 59-60.) Plaintiff testified that he also attends men's Bible study. Plaintiff testified that he goes to the grocery store with his wife to help carry groceries. Plaintiff testified that he has his driver's license but does not drive because he does not have a vehicle. (Tr. 30-32.)

During the hearing, counsel informed the ALJ that plaintiff sought disability benefits on the basis of his mental impairments only. (Tr. 57-58.)

B. <u>Testimony of Vocational Expert</u>

Delores E. Gonzales, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Gonzales classified plaintiff's past work as a material handler as heavy and semi-skilled; as a dishwasher, kitchen helper and bus cleaner as medium and unskilled; and as a janitor as heavy and unskilled. (Tr. 73-74.)

The ALJ then asked Ms. Gonzales to assume an individual of plaintiff's education, training and work experience, and to further assume that such an individual could

perform medium work with the following
limitations, climb stairs and ramps
occasionally; climb ropes, ladders and
scaffolds never; stoop, kneel, crouch
occasionally; crawl never. This individual
can understand, remember and carry out at
least simple instructions, non-detailed tasks,
maintain concentration and attention for 2
hour segments over an 8 hour period. Respond
appropriately to a supervisor and coworkers in
a task oriented setting and adapt to routine
simple work changes.

(Tr. 74-75.)

Ms. Gonzales testified that such a person could perform plaintiff's past relevant work as a kitchen helper and dishwasher. (Tr. 75.)

The ALJ then asked Ms. Gonzales to assume an individual with the same limitations as set out above, but that the individual was limited to light work instead of medium. Ms. Gonzales testified that such a person could not perform any of plaintiff's past relevant work. Ms. Gonzales testified that such a person could perform work as an usher, which was light and unskilled. Ms. Gonzales testified that 1,620 such jobs existed in the St. Louis area; with 2,820 in the State of Missouri and 101,530 nationally. Ms. Gonzales also testified that such a person could also perform work as an assembler, which was light and unskilled. Ms. Gonzales testified that 3,000 such jobs existed in the St. Louis area; with 6,320 in the State of Missouri and 280,160 nationally. (Tr. 75-76.)

The ALJ then asked Ms. Gonzales to assume the same

individual as described in the second hypothetical, but that the person was unable to maintain concentration or attention for two-hour segments over an eight-hour period. Ms. Gonzales testified that such a person would be precluded from employment. (Tr. 76.)

Plaintiff's counsel asked Ms. Gonzales to assume an individual of the plaintiff's age, education and work experience who is also "limited to the need to be absent from work three times a month or more on a regular basis." Ms. Gonzales testified that such a person would "not be able to maintain employment being gone that much." (Tr. 76.)

### III. Medical, Education and Counselor Records[1]

At the conclusion of seventh grade for the 1979-80 school year, plaintiff received the following grades: D+ in Physical Education; D's in Science, Spelling, and Reading; and F's in English and Mathematics. (Tr. 170.) Plaintiff's math teacher reported that plaintiff was very immature and solved problems in inappropriate ways, and opined that plaintiff would need to be

---

[1]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treatment notes dated June 2, 2009, through September 28, 2009, from BJC Behavioral Health (Tr. 411-24); and records dated February 12, 2008, to September 21, 2009, from Myrle Hillard Davis Comprehensive Health Centers (Tr. 425-90). The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

placed in a "low group" if he was to succeed at school.  (Tr. 171.)
Plaintiff's English teacher reported that plaintiff had a short
attention span and did not listen to follow instructions.  It was
noted that plaintiff would perform better with one-on-one
instruction.  (Tr. 217.)

On April 27, 1981, the Special School District of St.
Louis County evaluated plaintiff to determine his placement at
school.  Plaintiff was fifteen years of age and in the eighth
grade.  Plaintiff's most recent IQ scores, measured in 1976, were
noted to be verbal, 87; performance, 95; and full scale, 90.  It
was noted that plaintiff's current level of intellectual
functioning was reflected by the above-noted IQ scores.  Vision
testing showed plaintiff's visual memory skills to be weak in that
he had difficulty remembering facts presented visually.  (Tr. 152.)
Plaintiff passed the hearing screening.  Plaintiff's behavior was
noted to be disruptive with demonstrations of short attention span,
poor impulse control and episodes of acting out, poor motivation
and unpreparedness requiring much supervision, lack of compliance
with rules and directions, argumentation, teasing peers,
frustration, and weak self-concept.  It was noted that plaintiff
respected property.  (Tr. 153.)  Plaintiff's pre-vocational skills
were noted to be weak inasmuch as he was frequently tardy, did not
follow directions consistently, and demonstrated poor organization.
Motor coordination was good.  Reading was noted to be an area of

concern in that plaintiff was recognizing words at a third grade level and demonstrated reading comprehension skills at a second grade level. Such scores were noted to represent a significant deficit. Written expression showed similar concern with plaintiff spelling words at the third grade level. It was noted that plaintiff had difficulty with sentence formation and could not organize his ideas into paragraphs. It was noted that plaintiff was receiving an F in English due to poor skills and poor work completion. Plaintiff's math skills placed him at the fourth grade level, with demonstrated abilities to perform addition, subtraction and multiplication of whole numbers. Upon review of the information, the evaluation team concluded that plaintiff suffered from a behaviorally disordered handicap in addition to being learning disabled. (Tr. 154-55.)

At the conclusion of eighth grade for the 1980-81 school year, plaintiff received the following grades: D+ in Math; D- in Physical Education; and F's in English, Arithmetic, Science, and Typing. (Tr. 169.)

Upon review of plaintiff's IEP in October 1981, it was noted that plaintiff was repeating eighth grade, but showed tremendous improvement with a positive and serious attitude toward school. Plaintiff expressed interest in attaining the ninth grade program in January and expressed motivation to earn the necessary grades for such program. It was noted that plaintiff continued to

need prompting to start and complete tasks and continued to need improvement with organization, but that attendance and punctuality were good.  It was determined that plaintiff would continue to receive resource services for math assistance, with placement in the regular classroom for all regular classes.  (Tr. 149-51.)

At the conclusion of eighth grade for the 1981-82 school year, plaintiff received the following grades:  A- in School Services; D+ in Speech; D in English; D- in Mathematics; and F's in Arithmetic, Economics, and Physical Education.  (Tr. 168.)

Plaintiff underwent a consultative psychological evaluation for disability determinations on November 24, 2003. Plaintiff was thirty-seven years of age.  Dr. Lloyd Irwin Moore noted plaintiff to be cooperative, yet reported the interview to be difficult given plaintiff's distractibility and difficulty with times and places.  Dr. Moore noted plaintiff to live with his grandmother and that his mother brought him to the appointment. Plaintiff reported that he was expelled from high school in the tenth grade because of disruptive behavior.  Plaintiff reported that he had been placed in special education and had difficulty reading and writing.  Plaintiff reported having a poor work record and that he had been fired from previous employment on account of fighting, arguing and stealing.  Plaintiff reported that he is unable to get along with people and has difficulty in any kind of work environment.  Plaintiff reported that he currently has no

friends and that his activities include watching television and helping his grandmother. Dr. Moore noted plaintiff to have recently been diagnosed with diabetes. Plaintiff reported that he goes to Hopewell Clinic every day and has done so since 2001. Plaintiff reported that he deals with depression and that he has had suicidal ideation with attempts in the past. Plaintiff reported that he hears voices telling him to kill himself and that he sometimes sees monsters and devils. Plaintiff reported having such phenomena for several years. Plaintiff's affect was blunted and his mood dysthymic. It was noted that plaintiff's current medications included Remeron,[2] Depakote,[3] Glucotrol,[4] and Metformin.[5] Dr. Moore observed plaintiff to be very unkempt and disheveled and somewhat odoriferous. Dr. Moore noted plaintiff to do very poorly on the mini-mental status examination. Dr. Moore opined that plaintiff was disorganized and did not focus on external stimuli in a productive manner. Dr. Moore noted plaintiff's judgment to be

---

[2]Remeron is used to treat depression. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697009.html>.

[3]Depakote (valproic acid) is used to treat mania is people with bipolar disorder. Medline Plus (last revised Jan. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html>.

[4]Glucotrol is used to treat type 2 diabetes. Medline Plus (last revised July 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684060.html>.

[5]Metformin is used to treat type 2 diabetes. Medline Plus (last revised Apr. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html>.

fair, at best, and his insight to be very poor. Upon conclusion of the evaluation, Dr. Moore diagnosed plaintiff with bipolar disorder and poly-substance dependence in sustained, full remission. Dr. Moore assigned a Global Assessment of Functioning (GAF) score of 45.[6] As to plaintiff's functional limitations, Dr. Moore opined that plaintiff was able to perform basic activities of daily living, but had difficulty with both peers and authority figures. Dr. Moore opined that plaintiff had very poor concentration, persistence and pace. With respect to episodes of decompensation, Dr. Moore noted plaintiff's poor work history and his lack of competitive employment since age twenty-three. Dr. Moore opined that the evaluation did not project positive employability. Dr. Moore opined that plaintiff was not capable of handling funds in his own best interest. (Tr. 257-62.)

Plaintiff was admitted to St. Alexius Hospital on April 20, 2006, for psychiatric service. Upon admission, plaintiff reported to Dr. Rolf I. Krojanker that he had had a nervous breakdown. Dr. Krojanker noted that plaintiff was his patient at Hopewell Clinic, but that plaintiff's visits and compliance with medication there were sporadic. Plaintiff reported that his wife

---

[6] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

recently left and that he began using alcohol, marijuana and cocaine. Plaintiff reported hearing his grandfather's voice and having nightmares. Dr. Krojanker noted plaintiff to be presently depressed with paranoid trends. Dr. Krojanker assigned a GAF score of 20, noting that 33[7] was the highest score achieved within the previous year. Plaintiff's history of bipolar disorder, diabetes mellitus, hypertension, eczema, substance abuse, and alcohol abuse was noted. Dr. Krojanker also noted plaintiff to possibly suffer from dyssocial personality. Plaintiff's current medications were noted to include Risperdal,[8] Depakote and Remeron. Plaintiff reported that he lived with his mother and used cocaine and marijuana. Alcohol, cocaine and cannabis levels were positive upon admission. Physical examination was essentially unremarkable. It was recommended that plaintiff continue with his medications for diabetes and hypertension. It was noted that plaintiff would be followed by Dr. Krojanker at Hopewell Clinic for bipolar disorder and generally by his primary physician, Dr. Turner. Thiamine was

[7]A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[8]Risperdal is used to treat the symptoms of schizophrenia, and is also used to treat episodes of mania or mixed episodes in persons with bipolar disorder. Medline Plus (last revised June 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html>.

to be started for alcohol abuse.  Plaintiff was instructed to take Tylenol for pain.  Plaintiff was discharged on April 26, 2006. Upon discharge, Dr. Krojanker opined that plaintiff's prognosis was guarded given his noncompliance with medications and keeping appointments in the past.  (Tr. 280-86.)

Plaintiff appeared for an appointment at Comprehensive Health Centers on April 28, 2006.  It was noted that plaintiff was late for his appointment.  Plaintiff's history of hypertension, depression and bipolar disorder was noted.  Plaintiff's medications were noted to include insulin, Wellbutrin,[9] Depakote, Remeron, and Risperdal.  Plaintiff was prescribed Accupril.[10]  Plaintiff was instructed to return in three months.  (Tr. 268-69.)

Plaintiff was assessed at BJC Behavioral Health on June 16, 2006.  Plaintiff reported that he needed a case worker, help obtaining medication, and help with his diabetes.  Plaintiff reported having a low mood with a history of hallucinations. Plaintiff reported that he was a "wreck" when he did not take his medications.  Plaintiff reported that he often forgets to take his medication on time and that his mother calls to remind him. Plaintiff reported feeling anxious and jittery, and that he gets

---

[9]Wellbutrin (Bupropion) is used to treat depression.  <u>Medline Plus</u> (last revised Oct. 1, 2009)<<u>http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a695033.html</u>>.

[10]Accupril is used to treat high blood pressure.  <u>Medline Plus</u> (last revised Sept. 1, 2010)<<u>http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a692026.html</u>>.

angry when things do not go his way. Plaintiff reported having thoughts of suicide in the past and having recently attempted suicide in April 2006. Plaintiff reported that he had no current thoughts of suicide. It was noted that plaintiff's current medications were Remeron, Bupropion, Risperdal, and Depakote as prescribed by Dr. Krojanker at the Hopewell Center. Plaintiff reported being abstinent from drugs and alcohol since April 2006. Mental status examination showed plaintiff to be agitated and to squirm in his seat. Plaintiff's flow of thought was noted to be logical and sequential. Plaintiff's mood was noted to be a little depressed and his affect to be matter-of-fact. Plaintiff appeared to be in a good mood and reported taking medication that he felt was helping. Plaintiff's intellect was estimated to be below average. Upon conclusion of the assessment, plaintiff was determined to be at high risk for using drugs and gambling once he obtained income. Plaintiff was diagnosed with bipolar disorder, type II; depression; and alcohol, crack and cannabis abuse in early remission. Plaintiff was assigned a GAF score of 55.[11] It was determined that Dr. Baber would evaluate plaintiff for an admitting diagnosis and medication services. It was noted that a master treatment plan would be established for plaintiff. (Tr. 301-11.)

Plaintiff underwent a psychiatric evaluation on June 26,

_____

[11]A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

2006, at BJC Behavioral Health.  Dr. Baber noted that plaintiff recently transferred to BJC from Hopewell Clinic.  Plaintiff reported being very depressed since being out of medication. Plaintiff reported having experienced extreme mood swings with depressive episodes lasting two to three weeks and manic episodes lasting two to three days.  Plaintiff reported having auditory hallucinations.  Dr. Baber noted plaintiff's long history of psychiatric issues, as well as his history of behavioral problems and learning issues in school.  It was noted that plaintiff had been diagnosed with hypertension and diabetes mellitus and had been treated for schizophrenia and bipolar disorder-manic depressive. Plaintiff reported having previously used crack cocaine and alcohol but that he had been abstinent for two to three months. Plaintiff's current medications were noted to be Depakote, Remeron, Risperdal, Wellbutrin, Accupril, and insulin.  Plaintiff reported having no legal problems and that he regularly took his medication. Mental status examination showed plaintiff to have a depressed mood and blunted affect.  Plaintiff was able to recall two out of three words.  Plaintiff could not perform simple multiplication nor do serial seven's or serial three's.  Plaintiff was noted to get easily frustrated and to get upset easily under stress.  Dr. Baber diagnosed plaintiff with bipolar disorder-rule out type II, and was assigned a GAF score of 55.  Plaintiff was instructed to continue with Remeron as prescribed and to change dosages of Depakote and

Risperdal. Wellbutrin was prescribed. (Tr. 350-53.)

Plaintiff visited Community Health Plus at BJC Behavioral Health on July 6, 2006, to establish a treatment and rehabilitation plan. It was noted that Dr. Baber was plaintiff's psychiatrist. Plaintiff reported that medication was helping. Plaintiff's diagnosis of type II bipolar disorder was noted. Goals were identified and a plan was established for plaintiff to maintain sobriety, continue with his treatment regimen, and to obtain social security and find a job. Plaintiff was assigned a GAF score of 55. (Tr. 321-27.)

Plaintiff returned to Comprehensive Health Centers on August 18, 2006, for prescription refills and reported having no pain. It was noted that plaintiff was discharged with six medications and instructed to return in October 2006. (Tr. 267-68.)

Plaintiff returned to Dr. Baber at BJC Behavioral Health on August 22, 2006, and reported fluctuating moods. Plaintiff reported not having suicidal or homicidal ideation but that he was having vague auditory hallucinations and vivid dreams. Plaintiff reported that he continued to have feelings of hopelessness and helplessness. Plaintiff's affect was appropriate and his insight and judgment were fair. Plaintiff was instructed to decrease Remeron, increase Wellbutrin, and to take his other medications as prescribed. (Tr. 349.)

Plaintiff did not appear for a scheduled eye appointment at Comprehensive Health Centers on August 28, 2006. (Tr. 267.)

Plaintiff visited Dr. Baber at BJC Behavioral Health on September 7, 2006, and reported being depressed and under stress. Plaintiff reported that he was unable to sleep because of frustration and that he was angry with waiting for disability benefits. Plaintiff reported having used cocaine. Dr. Baber noted plaintiff to rant and rave but to eventually calm down. Plaintiff denied any suicidal or homicidal ideation. Plaintiff was instructed to increase his dosage of Risperdal and to return in one month for follow up. (Tr. 348.)

On September 14, 2006, BJC Behavioral Health reviewed plaintiff's treatment plan. It was noted that plaintiff was compliant with his medication, had kept all of his appointments at BJC, and had remained sober since May. (Tr. 329.)

Plaintiff returned to Dr. Baber at BJC Behavioral Health on October 5, 2006. Plaintiff reported that he was less irritable and that his mood was okay. Plaintiff reported occasional anger and frustration, but that he had improved. Vague paranoia was noted. Plaintiff was noted to be fairly reasonable. Plaintiff reported that he was not taking his medications as often, and compliance was encouraged. (Tr. 347.)

Plaintiff returned to Comprehensive Health Centers on October 16, 2006, for prescription refills. Plaintiff also

complained that a tree had recently fallen on his left hand. Plaintiff reported that he was out of insulin. (Tr. 266-67.)

Plaintiff visited Dr. Baber at BJC Behavioral Health on November 28, 2006, and reported that he recently ran out of medication. It was noted that plaintiff smelled of alcohol, but plaintiff denied alcohol use. Plaintiff reported having decreased sleep but a good energy level. Plaintiff expressed concern that he may become homeless and have to go to a shelter. Dr. Baber instructed plaintiff to continue with Depakote and Risperdal. Plaintiff was not given Wellbutrin since he refused to take a breathalizer test. (Tr. 345.)

Plaintiff returned to Comprehensive Health Centers on December 11, 2006, for prescription refills. Plaintiff's history of diabetes mellitus, hypertension and depression was noted. Upon examination, plaintiff was diagnosed with diabetes mellitus, uncontrolled; and hypertension, controlled. Plaintiff was given a refill of Accupril and insulin. (Tr. 264.)

On December 21, 2006, BJC Behavioral Health reviewed plaintiff's treatment plan. Plaintiff's current medications were noted to be Depakote and Risperdal. It was noted that plaintiff took his medications daily, maintained his house and was working odd jobs for his family. Given plaintiff's ability to maintain his mental health and independent living, it was recommended that plaintiff be moved to the CPM Maintenance program. (Tr. 332.)

Plaintiff did not appear at BJC Behavioral Health for a scheduled appointment on January 15, 2007.  (Tr. 346.)

Plaintiff returned to Dr. Baber at BJC Behavioral Health on February 8, 2007, and reported that he was almost out of his medications.  Plaintiff reported that he had not had any alcohol for two months, was doing okay and had no problems.  Plaintiff reported that his mood was good and denied any major mood swings.  Plaintiff reported his concentration and memory to be good and that he had no suicidal or homicidal ideation.  Dr. Baber noted plaintiff to appear to have a different agenda and that it was difficult to assess him.  Plaintiff was instructed to continue with his current medications and to follow up in one month.  (Tr. 344.)

On March 8, 2007, plaintiff failed to appear for a scheduled appointment at BJC Behavioral Health.  (Tr. 344.)

Plaintiff visited Dr. Baber at BJC Behavioral Health on April 26, 2007, where his continued use of alcohol was questioned.  Plaintiff reported that he had been out of medication for some time but that he had taken some medication that he had saved from the past.  Plaintiff requested a letter so that he could get disability, and he was told that "it would not be favorable."  Plaintiff continued to deny drinking alcohol, but alcohol could be smelled upon him.  Dr. Baber opined that plaintiff was not motivated to try to change and to quit drinking.  Plaintiff was instructed to continue with his current medications of Depakote and

Risperdal, and prescriptions were refilled.  (Tr. 343.)

Plaintiff visited Dr. Janell Houghton at BJC Behavioral Health on July 24, 2007, and complained of being depressed. Plaintiff reported that he was having problems with focus and that he felt down, discouraged and hopeless.  Plaintiff admitted having suicidal and homicidal ideation.  Mental status examination showed plaintiff to be alert and oriented times three.  Plaintiff's mood was depressed and his affect was noted to be anxious.  Insight and judgment were noted to be fair but improving.  Plaintiff was diagnosed with mood disorder, alcohol dependence and cocaine abuse. Plaintiff was assigned a GAF score of 65.[12]  Plaintiff was instructed to continue with Risperdal and to restart Wellbutrin. (Tr. 341-42.)

On July 26, 2007, plaintiff underwent a medical and psychiatric assessment at BJC Behavioral Health.  Plaintiff's diagnoses were noted to include mood disorder, alcohol dependence, cocaine abuse, anti-social personality disorder, diabetes, and high blood pressure.  Plaintiff's current GAF score was noted to be 65. Plaintiff's past psychiatric history was noted.  Plaintiff reported hearing his grandfather's voice but denied any other symptoms of psychosis.  Plaintiff reported that he experienced some improvement

_____

[12]A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

with his moods with his multiple medications, but never obtained complete resolution of symptoms. Plaintiff denied any recent suicidal or homicidal ideation and reported having not used alcohol or drugs in over a month. Plaintiff reported having run out of his medications about two weeks prior. Mental status examination showed plaintiff to be irritable, tearful and somewhat anxious. Plaintiff did not appear to respond to internal stimuli. Plaintiff's mood was noted to be depressed and his affect anxious, stable and congruent with his stated mood. Plaintiff's insight and judgment were noted to be fair. Dr. Houghton determined for plaintiff to continue with outpatient care. Plaintiff was prescribed Wellbutrin and was instructed to continue with Depakote and Risperdal. Plaintiff was instructed to return for follow up in one month. (Tr. 312-16.)

On July 26, 2007, plaintiff's BJC Behavioral Health treatment plan was amended to include plans regarding keeping appointments and maintaining medication compliance. It was noted that plaintiff recently began seeing Dr. Houghton after Dr. Baber left. (Tr. 317-18.)

Plaintiff was admitted to St. Alexius Hospital on August 16, 2007, with reports of having suicidal and homicidal thoughts. Plaintiff reported having a plan for suicide. It was noted that plaintiff had made a previous attempt two weeks prior by jumping into the highway. It was noted that plaintiff had smoked crack

cocaine. Plaintiff reported using cocaine daily during the previous two weeks, using marijuana when available, and drinking two six-packs of beer every day. Plaintiff reported that he lived with his mother and was trying to get disability benefits. There was no evidence of psychosis, but plaintiff reported hearing voices, including his grandfather's voice. Plaintiff's level of functioning was noted to be severely impaired. Plaintiff was noted to have a depressed mood with feelings of hopelessness and helplessness, as well as a diminished ability to concentrate. Plaintiff reported that he had been diagnosed with bipolar disorder and schizophrenia. Plaintiff's current medications were noted to include Depakote, Bupropion and Risperdal. Dr. Muhammed Arain suspected that plaintiff had not been compliant with taking his medication. Mental status examination showed plaintiff to be cooperative, alert and oriented times three. Plaintiff's recent and remote memory were noted to be intact. Plaintiff was noted to be evasive. Plaintiff's mood was depressed and his affect reactive. Dr. Arain noted plaintiff's thought processes to be logical and goal directed, with no looseness of association or flight of ideas. No evidence of paranoia or delusions was present. Dr. Arain noted plaintiff not to be responding to internal stimuli. Plaintiff's intellectual functioning was noted to be average, and his insight and judgment were limited. Dr. Arain diagnosed plaintiff with poly-substance dependence and depression. Substance

induced mood disorder was to be ruled out. Dr. Arain also suspected malingering for secondary gain, noting inconsistencies between plaintiff's reports and Dr. Arain's observations. Dr. Arain assigned a GAF score of 20. Plaintiff was prescribed Celexa[13] and Trazodone[14] upon admission. Plaintiff was discharged in stable condition on August 20, 2007. It was noted that plaintiff's suicidal and homicidal ideation had resolved during his admission. Plaintiff's prognosis upon discharge was noted to be fair, and he was instructed to follow up with Dr. Arain at Hopewell Clinic. (Tr. 271-78.)

Plaintiff did not appear for a scheduled appointment at BJC Behavioral Health on August 24, 2007. (Tr. 340.)

Plaintiff visited Dr. Houghton at BJC Behavioral Health on September 25, 2007. Plaintiff's recent hospitalization was noted. Dr. Houghton noted that plaintiff was discharged to Agape House. Plaintiff reported that he had had no alcohol or drugs for three months. Plaintiff reported having low mood, insomnia, crying, and decreased energy. Plaintiff denied any recent suicidal ideation. Dr. Houghton determined that plaintiff met the criteria for major depressive disorder and Trazodone was prescribed.

---

[13]Celexa is used to treat depression. Medline Plus (last revised Feb. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html>.

[14]Trazodone is used to treat depression and is sometimes used to treat insomnia, schizophrenia and anxiety. Medline Plus (last revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

Plaintiff was instructed to continue with his current medications, to continue with his primary care physician at Grace Hill, and to continue with his aftercare at Agape.  (Tr. 338.)

Plaintiff visited BJC Behavioral Health on October 26, 2007.  Dr. Houghton noted plaintiff to continue to express frustration about not having a job and having difficulty with finances.  Plaintiff denied any suicidal or homicidal ideation.  It was noted that plaintiff had been denied disability.  Plaintiff reported being compliant with his medication but that he was having nightmares.  (Tr. 339.)

Plaintiff visited Dr. Houghton on November 8, 2007, and reported continued depression with low mood and crying spells.  It was noted that plaintiff had been compliant with his medication. Plaintiff reported having some passive thoughts of death but no plan.  Dr. Houghton noted plaintiff to display forward thinking. Dr. Houghton determined to continue plaintiff on outpatient treatment and instructed plaintiff to continue with his current medications.  Plaintiff was instructed to return in one month. (Tr. 336.)

Plaintiff was admitted to Oak Knoll Nursing and Rehabilitation Center on November 30, 2007. Plaintiff's admitting diagnoses were bipolar disorder, major depressive disorder, diabetes, and history of alcohol and cocaine abuse.  Plaintiff was noted to be alert, pleasant and friendly upon admission.  Plaintiff

was noted to understand quickly and to have good motivation. (Tr. 291-95.)

On December 7, 2007, plaintiff visited Dr. Houghton and reported that he was compliant with his medications but continued to have vivid dreams, although they had decreased with Risperdal. Plaintiff complained of having some crying spells and fatigue. Plaintiff denied any cravings for alcohol. Plaintiff's mood was noted to be depressed and his affect dysphoric and stable. Plaintiff's insight and judgment were noted to be good. Plaintiff's medications were noted to include Trazodone, Wellbutrin and Risperdal. Plaintiff was diagnosed with major depressive disorder and alcohol/cocaine dependence in early full remission. Plaintiff was instructed to continue with his current treatment. (Tr. 337.)

Drug tests administered on December 10, 2007, yielded negative results. (Tr. 298-99.)

BJC Behavioral Health reviewed plaintiff's treatment plan on December 13, 2007. Plaintiff reported that he continued to attend narcotics/alcoholics anonymous (NA/AA) and maintained his sobriety. It was noted that plaintiff had been fairly compliant with his appointments and reported that he took his medications as prescribed. Plaintiff's diagnoses were noted to be mood disorder, alcohol dependence and cocaine use. Plaintiff was assigned a GAF score of 65. No medication changes were noted. (Tr. 319.)

Plaintiff visited Dr. Houghton on January 18, 2008, and complained that he continued to have low mood, insomnia, crying, and guilt. Plaintiff denied any suicidal ideation. Plaintiff denied any alcohol or drug use and reported that he was going to meetings. Dr. Houghton noted plaintiff's mood to be depressed and his affect dysphoric. Plaintiff's insight and judgment were noted to be good. Plaintiff was diagnosed with major depressive disorder, and alcohol and cocaine dependence in remission. Plaintiff was instructed to continue with his medications and to continue working with his case manager. (Tr. 403.)

During a diabetes follow up visit at Comprehensive Health Centers on February 12, 2008, it was noted that plaintiff was living in a group home. Review of systems showed no depression. (Tr. 458.)

On February 19, 2008, Dr. Judith McGee completed a Psychiatric Review Technique Form (PRTF) for disability determinations in which she opined that plaintiff's impairments of major depressive disorder and substance abuse/dependence in remission resulted in a moderate degree of limitations in plaintiff's activities of daily living and in plaintiff's ability to maintain concentration, persistence or pace. Dr. McGee further opined that such impairments caused mild limitations in plaintiff's ability to maintain social functioning. Dr. McGee stated that there was insufficient evidence upon which to base a finding as to

whether plaintiff experienced repeated episodes of decompensation. (Tr. 354-65.)

In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr. McGee opined that, in the domain of understanding and memory, plaintiff experienced moderate limitations in his ability to understand and remember detailed instructions, but had no significant limitations in his ability to remember locations and work-like procedures and to understand and remember very short and simple instructions. In the domain of sustained concentration and persistence, Dr. McGee opined that plaintiff was moderately limited in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods. Dr. McGee opined that plaintiff had no significant limitations in his ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within regular tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. In the domain of social interaction, Dr. McGee opined that plaintiff had moderate limitations in his ability to accept instructions and respond appropriately to criticism from supervisors, and to get

along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. McGee further opined that plaintiff had no significant limitations in his ability to interact appropriately with the general public, to ask simple questions or request assistance, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. In the domain of adaptation, Dr. McGee opined that plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting. Dr. McGee further opined that plaintiff had no significant limitations in his ability to set realistic goals or make plans independently of others. (Tr. 366-68.)

Plaintiff failed to appear for a scheduled appointment with Dr. Houghton on March 3, 2008. (Tr. 403.)

In a Mental Medical Source Statement (MMSS) dated March 20, 2008, Dr. Houghton reported plaintiff's diagnoses to be major depressive disorder, recurrent; alcohol dependence, in remission; and cocaine dependence, in remission. Dr. Houghton opined that in the domain of daily living, plaintiff was markedly limited in his ability to behave in an emotionally stable manner and to maintain reliability. Dr. Houghton further opined that plaintiff had moderate limitations in his ability to cope with normal work stress and to function independently. In the domain of social functioning, Dr. Houghton opined that plaintiff had marked

limitations in his ability to relate in social situations, to interact with the general public, and to accept instructions and respond to criticism.  Dr. Houghton further opined that plaintiff had moderate limitations in his ability to maintain socially acceptable behavior.  In the domain of concentration, persistence and pace, Dr. Houghton opined that plaintiff had extreme limitations in his ability to understand and remember simple instructions, to make simple work-related decisions, to maintain regular attendance and be punctual, to complete a normal workday and workweek without interruptions from symptoms, and to maintain attention and concentration for extended periods.  Dr. Houghton further opined that plaintiff had marked limitations in his ability to perform at a consistent pace without an unreasonable number and length of rest periods, to sustain an ordinary routine without special supervision, to respond to changes in work settings, and to work in coordination with others.  Dr. Houghton reported that, within the previous year, plaintiff had three episodes of decompensation that lasted at least two weeks.  Dr. Houghton opined that plaintiff had a substantial loss of ability to understand, remember and carry out simple instructions; to make judgments that are commensurate with the functions of unskilled work; to respond appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting.  Dr. Houghton opined that the stated limitations had lasted or were expected to

last twelve continuous months.  Dr. Houghton reported the onset date of the stated limitations at the assessed severity to be March 12, 2007.  Dr. Houghton reported plaintiff's GAF score to be 55. (Tr. 370-73.)  Dr. Houghton summarized:

> The patient has been in remission from both alcohol and cocaine but continues to experience depression along with neuro vegetative symptoms like crying spells, insomnia, fatigue, poor concentration, excessive worry, and feeling worthless.  The patient has been impaired in his ability to be receptive to the information presented during his ongoing alcohol and drug treatment, secondary to these symptoms.  They would also make it difficult for him to function at any type of job.

(Tr. 373.)

Plaintiff visited Dr. Houghton on March 24, 2008, and complained of continued crying spells and frustration.  Plaintiff reported having periodic auditory hallucinations but denied any other psychotic symptoms.  Plaintiff denied any alcohol or drug use.  Plaintiff's mood was noted to be angry and his affect frustrated.  Dr. Houghton continued in her diagnoses of major depressive disorder, and alcohol and cocaine dependence in remission.  Plaintiff was instructed to continue with his medications.  (Tr. 404.)

Results of random drug and alcohol testing on April 22, 2008, were negative.  (Tr. 374-75.)

Plaintiff returned to Dr. Houghton on April 24, 2008, and

reported that his mood was better. Plaintiff reported being compliant with his medications. Plaintiff denied any hallucinations, delusions or suicidal/homicidal ideation. Plaintiff's mood was noted to be okay and his affect was brighter. Plaintiff's medications were noted to include Risperdal, Wellbutrin and Trazodone. Dr. Houghton continued in her diagnoses of major depressive disorder, and alcohol and cocaine dependence in remission. Plaintiff was instructed to continue with his current medications and to return in four weeks. (Tr. 402.)

Plaintiff returned to Dr. Houghton on May 19, 2008. Plaintiff reported that he had been compliant with his medication. Plaintiff reported having some irritability, insomnia, poor energy, and excessive worrying. Plaintiff reported that he continued to have crying spells. Plaintiff denied any alcohol or drug use and reported that he attended AA meetings twice weekly. Plaintiff denied any hallucinations or delusions and reported that he had no suicidal or homicidal ideation. Plaintiff's mood was noted to be "up and down" and his affect was irritable. Plaintiff's insight and judgment were noted to be good. Dr. Houghton continued in her diagnoses of plaintiff. Plaintiff was instructed to continue with his current medications and to return in four weeks to visit Dr. Gangure. (Tr. 400.)

On June 18, 2008, plaintiff underwent a psychiatric evaluation at BJC Behavioral Health. Plaintiff's primary complaint

was that he was waiting for disability.  Dr. Dinu Gangure noted plaintiff to be living in a group home and expressing guilt that his mother was paying his bills.  Plaintiff reported that he had limited sleep, fair mood and good appetite.  Dr. Gangure noted plaintiff's psychiatric history to include three or four admissions, multiple suicide attempts, and violence.  Dr. Gangure also noted plaintiff's history of substance abuse, noting that plaintiff had been "clean" for nearly a year.  Plaintiff's current medications were noted to be Depakote, Wellbutrin, Risperdal, and Trazodone.  Mental status examination showed plaintiff to be calm, cooperative, fairly well related, and to have good eye contact.  Plaintiff's mood was noted to be fair and his affect rather full.  Plaintiff's thought processes were goal oriented, and plaintiff's thought content showed no evidence of suicidal or homicidal ideation or paranoid delusional thinking.  Dr. Gangure noted plaintiff not to react to internal or external stimuli.  Plaintiff's insight was noted to be fairly good, with judgment noted to be rather good.  Plaintiff was alert and oriented times three and was able to answer basic memory questions.  Dr. Gangure diagnosed plaintiff with bipolar I disorder, most recent episode mixed, with history of psychotic features; poly-substance dependence in early full remission; rule out history of attention deficit hyperactivity disorder (ADHD); and suspected borderline intellectual functioning.  Dr. Gangure assigned plaintiff a GAF

score of 50 and recommended that plaintiff be provided psychiatric education and psychotherapy, adhere to medication recommendations, and continue with case management. It was determined that plaintiff would continue with his current medications. (Tr. 382-84.)

Plaintiff's treatment plan through BJC Behavioral Health was reassessed on June 27, 2008. Plaintiff reported that he had mood changes on a weekly cycle but did not have any suicidal or homicidal ideation. Plaintiff reported having occasional visual hallucinations. Plaintiff reported that sleep medication worked but that it had a short-term effect inasmuch as he awakens in the middle of the night and has difficulty going back to sleep. Plaintiff reported his memory to be improving. It was noted that plaintiff was recently transferred from Dr. Houghton to Dr. Gangure for psychiatric care. It was noted that plaintiff was compliant with his medications and appointments and had maintained sobriety for eleven months. It was noted that plaintiff continued to live at the Oak Knoll facility and that he hoped to move into his own apartment in the future. Plaintiff reported that he worked weekends at a daycare facility operated by his sister and that he hoped to obtain full time employment in the fall. Plaintiff's psychiatric medications were noted to include Bupropion, Depakote, Risperdal, and Trazodone. Upon conclusion of the reassessment, it was noted that plaintiff had good insight about his illness and had

been using good coping skills with respect thereto.  Plaintiff was noted to be independent, able to use public transportation for his appointments with doctors, and able to manage his schedule on his own.  It was recommended that plaintiff continue to see Dr. Gangure for his psychiatric treatment and rehabilitation and that he continue to receive case management services from BJC.  (Tr. 386-87.)

During his visit with Dr. Gangure on July 9, 2008, plaintiff reported that he was doing better.  Plaintiff reported that he made housing arrangements through BJC.  Dr. Gangure noted plaintiff to be alert, oriented, cooperative, and calm.  Dr. Gangure noted plaintiff's history of chronic auditory hallucinations but that plaintiff denied any current hallucinations.  Plaintiff also denied having any suicidal or homicidal ideation.  Plaintiff's mood was noted to be okay and his affect full.  Dr. Gangure noted plaintiff's interpersonal communication skills to be limited.  Plaintiff was able to answer basic memory questions well.  Dr. Gangure determined to continue the current treatment approach and encouraged plaintiff to comply with his medications.  (Tr. 401.)

On August 20, 2008, plaintiff appeared twenty minutes late for a scheduled appointment with Dr. Gangure.  It was noted that plaintiff was experiencing mood swings and irritability.  Plaintiff's mental status examination was otherwise unremarkable.

Plaintiff was instructed to continue with his medications, and the necessity of appearing on time for appointments was discussed. (Tr. 401.)

Results of random drug and alcohol testing on September 4, 2008, were negative. (Tr. 376-77.)

Plaintiff visited Dr. Gangure on September 23, 2008, who noted plaintiff to be alert, oriented, cooperative, and calm. Plaintiff's mood was noted to be okay and his affect full. Plaintiff's thought process was noted to be mostly goal oriented. It was noted that plaintiff wanted to continue with his current medications due to their effectiveness. Dr. Gangure noted there to be no side effects. Dr. Gangure determined to continue the current treatment approach with plaintiff. (Tr. 398.)

Plaintiff returned to Dr. Gangure on November 18, 2008, who noted plaintiff to be fifteen minutes late to his appointment. Dr. Gangure discussed with plaintiff steps to take so as not be late again. Plaintiff reported that he increased his dosage of Trazodone because of recent insomnia. Sleep hygiene measures were reviewed. Plaintiff denied recent use of any substances. Plaintiff denied suicidal or homicidal ideation. Plaintiff appeared not to be overtly paranoid or delusional. Plaintiff's mood was noted to be okay and his affect full. Plaintiff's thought processes were mainly goal directed. Plaintiff was instructed to increase his dosage of Risperdal. (Tr. 398-99.)

Plaintiff visited Dr. Gangure on December 7, 2008, and complained that Trazodone was not working well. Plaintiff reported no recent use of alcohol or drugs. Plaintiff reported having auditory hallucinations. Otherwise, mental status examination was unremarkable. Plaintiff denied having suicidal or homicidal ideation. Dr. Gangure changed plaintiff's primary psychiatric diagnosis from bipolar disorder to schizoaffective disorder. (Tr. 385, 397.)

Plaintiff did not appear for a scheduled appointment with Dr. Gangure on January 14, 2009. Plaintiff's case manager was notified. (Tr. 397.)

Plaintiff's appointment with Dr. Gangure on January 28, 2009, was rescheduled. Plaintiff's case manager was notified. (Tr. 396.)

Plaintiff visited Dr. Gangure on February 11, 2009. It was noted that plaintiff denied any recent use of alcohol or drugs. Plaintiff talked about recent dreams and reported having auditory hallucinations. Plaintiff was instructed to increase his dosage of Seroquel[15] and to continue with his other medications. (Tr. 395.)

Plaintiff visited Dr. Gangure on March 3, 2009, who noted plaintiff to be sleeping well on Trazodone. Mental status examination was unremarkable. Plaintiff denied any suicidal or

_____

[15]Seroquel is used to treat the symptoms of schizophrenia and to treat or prevent episodes of mania or depression in patients with bipolar disorder. Medline Plus (last revised May 16, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html>.

homicidal ideation. Plaintiff also denied any delusions or hallucinations. Plaintiff was instructed to increase his dosage of Seroquel. (Tr. 394.)

Plaintiff visited Dr. Gangure on April 7, 2009. Plaintiff reported no recent substance use. Mental status examination was unremarkable. Plaintiff was instructed to continue with his medications. (Tr. 393.)

On May 13, 2009, Dr. Gangure had a consultation with plaintiff's case manager during which plaintiff's history was reviewed and instruction was given for plaintiff to continue with his medications. There was also a question raised regarding the deadline for filing disability papers. (Tr. 393.)

Plaintiff visited Dr. Gangure on June 2, 2009. Mental status examination was unremarkable. Plaintiff denied any suicidal or homicidal ideation. Plaintiff's mood was neutral and his affect was full and appropriate. Plaintiff reported no delusions or hallucinations. Dr. Gangure diagnosed plaintiff with schizo-affective disorder; poly-substance dependence, in full sustained remission; rule out history of ADHD; and suspected borderline intellectual functioning. Dr. Gangure assigned a GAF score of 52. (Tr. 385, 392.)

Plaintiff underwent a psychosocial/clinical assessment at BJC Behavioral Health on June 2, 2009. Plaintiff's psychiatric history was noted. Plaintiff reported that he experienced mood

changes on a weekly cycle and sometimes had visual hallucinations. Plaintiff reported his memory to be "shaky" and to be worsening. Plaintiff reported that he sometimes forgets to take his medication but that his wife helps him. Plaintiff reported having a few episodes of suicidal ideation within the previous two weeks but that he currently had no suicidal or homicidal ideation. Plaintiff reported having difficulty managing his finances, but that he was working with his wife to create and maintain a budget. Plaintiff reported that he now gives his money to his wife who hides it so she can pay the bills. Plaintiff reported being fidgety and having sleep disturbances. It was noted that plaintiff's current medications were Depakote, Risperdal, Seroquel, Wellbutrin, and Trazodone. As to his history of substance abuse, plaintiff reported that he had been sober for twenty-two months. Plaintiff's recent diagnoses as given by Dr. Gangure were noted. It was noted that plaintiff resided at Oak Knoll from November 2007 to July 2008 whereupon he then lived with his mother for one week and then moved to his own apartment. Upon conclusion of the assessment, it was recommended that plaintiff continue to receive case management and medication services from BJC; continue to see his general physician for care of his physical health; continue to attend AA meetings and men's Bible study; and continue working with his attorney on his disability appeal. (Tr. 417-22.)

In an MMSS dated June 2, 2009, Dr. Gangure reported

plaintiff's diagnoses to be schizoaffective disorder; poly-substance dependence, in full sustained remission; rule out history of ADHD; and suspected borderline intellectual functioning. Dr. Gangure opined that in the domain of daily living, plaintiff was markedly limited in his ability to cope with normal work stress and to behave in an emotionally stable manner. Dr. Gangure further opined that plaintiff had moderate limitations in his ability to maintain reliability. Dr. Gangure further opined that plaintiff had no limitations in his ability to function independently and to adhere to basic standards of neatness and cleanliness. In the domain of social functioning, Dr. Gangure opined that plaintiff had marked limitations in his ability to accept instructions and respond to criticism. Dr. Gangure further opined that plaintiff had moderate limitations in his ability to relate to family, peers or care givers; to interact with strangers or the general public; and to maintain socially acceptable behavior. Dr. Gangure further opined that plaintiff had no limitations in his ability to ask simple questions or request assistance. In the domain of concentration, persistence and pace, Dr. Gangure opined that plaintiff had marked limitations in his ability to maintain attention and concentration for extended periods. Dr. Gangure further opined that plaintiff had moderate limitations in his ability to perform at a consistent pace without an unreasonable number and length of breaks, to sustain an ordinary routine without

special supervision, and to respond to changes in work settings. Dr. Gangure further opined that plaintiff had no limitations in his ability to make simple and rational decisions. Dr. Gangure opined that plaintiff could apply commonsense understanding to carry out simple one- or two-step instructions up to six hours a day; could interact with co-workers up to six hours a day; could interact appropriately with supervisors up to four hours a day; and could interact appropriately with the general public up to four hours a day. Dr. Gangure estimated that plaintiff's psychologically-based symptoms would cause him to miss three or more days of work each month, and would cause plaintiff to be late to work or to leave early from work at least three days each month. Dr. Gangure opined that the stated limitations had lasted or were expected to last twelve continuous months, and that plaintiff had such limitations at the assessed severity for five to six years. (Tr. 378-81.)

Plaintiff did not appear for a scheduled appointment with Dr. Alana Cox at BJC Behavioral Health on July 13, 2009. It was noted that plaintiff's case manager cancelled the appointment. (Tr. 391.)

Plaintiff visited Dr. Cox on September 14, 2009, and reported that he had run out of medication and was having poor sleep as a result. Plaintiff reported that he had Wellbutrin and Depakote but had run out of his other medications. Plaintiff's mood was noted to be fine and his affect euthymic. Plaintiff

reported increased stress due to an upcoming disability hearing. Plaintiff's flow of thought was noted to be logical and sequential. Dr. Cox authorized refills of medication prescriptions until plaintiff's follow up appointment which was scheduled in two weeks. (Tr. 423.)

During a visit at Comprehensive Health Centers on September 18, 2009, it was noted that plaintiff attended Caring Heart Adult Services Center upon referral from the psychiatric coordinator at BJC. (Tr. 429.)

Results of random drug and alcohol testing on September 28, 2009, were negative. (Tr. 405-06.)

Plaintiff underwent a medical and psychiatric assessment at BJC Behavioral Health on September 28, 2009. Plaintiff reported that he was depressed. Plaintiff reported that his medication helped and that he was trying to gain independence. Dr. Cox noted plaintiff's psychiatric history as well as his history of substance abuse. It was noted that plaintiff had been sober for two years. Plaintiff reported that he continued to have mood episodes and that he continued to get depressed. Plaintiff also reported having auditory hallucinations, generally of his grandfather's voice. It was reported that plaintiff talks to himself regularly. Dr. Cox noted plaintiff's current medications to include Depakote, Risperdal, Seroquel, Wellbutrin, and Trazodone. It was noted that plaintiff no longer lived in the nursing home, but lived with his

wife in an apartment. It was noted that plaintiff currently attended adult day care four days a week. Mental status examination showed plaintiff to be calm and cooperative. Dr. Cox noted plaintiff to become tearful when talking of his childhood. Plaintiff's flow of thought was noted to be tangential at times and somewhat circumstantial, but generally goal directed. Plaintiff's mood was noted to be depressed and his affect somewhat restricted. Recall to recent and remote events was intact. Dr. Cox noted plaintiff to be somewhat better since he had his medication refilled two weeks prior. It was determined that plaintiff would be weaned from oral Risperdal and would begin having Risperdal injections every two weeks. Dr. Cox diagnosed plaintiff with schizoaffective disorder, most recent episode mixed; polysubstance dependence, in full sustained remission; and history of borderline intellectual functioning. Dr. Cox assigned a GAF score of 50. (Tr. 413-16.)

In an MMSS dated September 28, 2009, Dr. Cox reported plaintiff's diagnosis to be "schizoaffective disorder, bipolar type, with chronic auditory hallucinations that interfere with functioning and requiring adult day care [four] days a week." Dr. Cox further noted that plaintiff required multiple hospitalizations in the past for mood and psychiatric symptoms. (Tr. 410.) Dr. Cox opined that in the domain of daily living, plaintiff was markedly limited in his ability to cope with normal work stress, behave in

an emotionally stable manner, and to maintain reliability.  Dr. Cox further opined that plaintiff had moderate limitations in his ability to function independently and to adhere to basic standards of neatness and cleanliness.  In the domain of social functioning, Dr. Cox opined that plaintiff had marked limitations in his ability to interact with strangers or the general public, to accept instructions or respond to criticism, and to maintain socially acceptable behavior.  Dr. Cox further opined that plaintiff had moderate limitations in his ability to ask simple questions or request assistance.  Finally, Dr. Cox opined that plaintiff had no limitations in his ability to relate to family, peers or care givers.  In the domain of concentration, persistence and pace, Dr. Cox opined that plaintiff had extreme limitations in his ability to maintain attention and concentration for extended periods.  Dr. Cox further opined that plaintiff had marked limitations in his ability to perform at a consistent pace without an unreasonable number and length of breaks, to sustain an ordinary routine without special supervision, and to respond to changes in work settings.  Dr. Cox further opined that plaintiff had moderate limitations in his ability to make simple and rational decisions.  Dr. Cox opined that plaintiff could apply commonsense understanding to carry out simple one- or two-step instructions up to two hours a day; could interact appropriately with co-workers up to two hours a day; could interact appropriately with supervisors up to two hours a day; and could

interact appropriately with the general public up to two hours a day.  Dr. Cox estimated that plaintiff's psychologically-based symptoms would cause him to miss three or more days of work each month, and would cause plaintiff to be late to work or to leave early from work at least three days each month.  Dr. Cox opined that the stated limitations had lasted or were expected to last twelve continuous months, and that plaintiff had such limitations at the assessed severity since 2000.  (Tr. 407-10.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since November 30, 2007.  The ALJ determined that plaintiff's diabetes mellitus and schizoaffective disorder constituted severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  The ALJ found plaintiff to have the RFC to perform light work with the following additional limitations:  he can occasionally climb stairs or ramps, stoop, kneel, and crouch; he cannot crawl or climb ropes, ladders or scaffolds; he can understand, remember and carry out at least simple instructions and non-detailed tasks; he can maintain concentration and attention for two-hour segments over an eight-hour period; he can respond appropriately to supervisors and co-workers in a task-oriented setting; and he can adapt to routine/simple work changes.  The ALJ

found plaintiff unable to perform any of his past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that there existed a significant number of jobs in the national economy that plaintiff could perform, such as usher and assembler to which the vocational expert testified. The ALJ therefore found plaintiff not to be under a disability at any time since November 30, 2007. (Tr. 9-18.)

## V. Discussion

To be eligible for Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. § 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial

evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Here, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ erred in rejecting the opinions of plaintiff's three treating psychiatrists by engaging in an insufficient analysis thereof. Plaintiff also argues that the ALJ erred by failing to engage in proper analysis of the opinion rendered by the state agency non-examining consultant. In addition, plaintiff argues that the ALJ erred in finding plaintiff's subjective complaints not to be credible. Finally, plaintiff contends that the ALJ's determination of plaintiff's RFC is not supported by substantial evidence inasmuch

as the ALJ improperly based his finding on the opinion of a non-examining consultant.  The Court addresses each of plaintiff's contentions in turn.

A.    Opinion Evidence

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources and non-examining sources.  See 20 C.F.R. § 416.927(f)(2)(ii).  The Regulations require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. § 416.927(d)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  Id.; see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004).  This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(d)(2).

As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The ALJ may discount or disregard such opinions if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). In addition, inconsistency with other substantial evidence alone is sufficient to discount a treating physician's opinion. Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 416.927(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence

in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. § 416.927(d)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. § 416.927(d)(2).

Against this backdrop, the undersigned turns to plaintiff's claims that the ALJ erred in his analysis of and the weight accorded to the opinions of plaintiff's treating psychiatrists, as well as to the opinion of the non-examining state agency consultant.

1. *Opinion Evidence from Treating Psychiatrists, Drs. Houghton and Gangure*

In his written decision, the ALJ noted that he considered the opinions of Drs. Houghton and Gangure as expressed in their questionnaires and found them to be inconsistent with treatment notes as summarized by the ALJ. The ALJ further stated that Dr. Houghton's GAF score of 55 as assigned in March 2008 and Dr. Gangure's GAF score of 52 as assigned in June 2009 were inconsistent with their opinions. (Tr. 16.) It thus appears that the ALJ determined to accord little or no weight to the opinions of these treating psychiatrists.

As an initial matter, the undersigned notes that the treatment records of Drs. Houghton and Gangure summarized by the ALJ consisted primarily of those from April to July 2008 during which plaintiff reported that he felt "better," Dr. Houghton stated

that plaintiff appeared "brighter," and plaintiff exhibited independence and management of his schedule and transportation needs.[16] (Tr. 15-16.) From these reports and statements made during this period, the ALJ determined that "notes from treatment do not portray an individual who would be unable to work due to mental health-related symptoms." (Tr. 16.) Relying on this four-month snapshot to discount the opinions of plaintiff's long-term treating psychiatrists was error.

In cases involving mental impairments, recognition must be given to the instability of such conditions and their waxing and waning nature after manifestation. See Rowland v. Astrue, 673 F. Supp. 2d 902, 920-21 (D.S.D. 2009) (citing Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995)). As noted by the Eighth Circuit, "[i]t is inherent in psychotic illnesses that periods of remission will occur[.] . . . Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996) (internal quotation marks and citations omitted). Given that a claimant's level of mental functioning may seem relatively adequate at a specific time, proper evaluation of the impairment must take into account a claimant's

---

[16]The ALJ states that plaintiff reported such independence and management skills to Dr. Gangure during a visit on August 13, 2008. (Tr. 15.) The record shows, however, that such report was made to a clinical social worker at BJC Behavioral Health on June 27, 2008, during the annual assessment of plaintiff's treatment plan. Dr. Gangure signed off on this assessment on August 13, 2008. (Tr. 386-87.)

level of functioning "over time." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(D)(2). Longitudinal evidence is thus needed to properly evaluate the level of a mental impairment. Id.; see also Andler, 100 F.3d at 1393. The ALJ here ignored significant longitudinal evidence of plaintiff's serious mental deficits when finding the opinions of plaintiff's treating psychiatrists to be inconsistent with treatment records. Indeed, a review of the record as a whole shows that subsequent to the reports of plaintiff's relatively adequate functioning upon which the ALJ relied, plaintiff again experienced hallucinations, mood swings and sleep disturbances despite continued therapy and adjustments to multiple psychotropic medications.

In addition, the ALJ failed to acknowledge that during this limited period of relative functional improvement, plaintiff was living at Oak Knoll, a residential care facility, and was monitored by a case manager through BJC. A review of the record shows plaintiff's treating psychiatrist to have consulted with plaintiff's case manager on numerous occasions regarding plaintiff's treatment regimen and the scheduling of appointments. In addition, upon discharge from Oak Knoll, plaintiff attended adult day care four days a week.

> Particular problems are often involved in
> evaluating mental impairments in individuals
> who have long histories of repeated
> hospitalizations or prolonged outpatient care
> with supportive therapy and medication. For

> instance, if you have chronic organic,
> psychotic, and affective disorders, you may
> commonly have your life structured in such a
> way as to minimize your stress and reduce your
> symptoms and signs. In such a case, you may
> be much more impaired for work than your
> symptoms and signs would indicate.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(E).

> Particularly in cases involving chronic mental
> disorders, overt symptomatology may be
> controlled or attenuated by psychosocial
> factors such as placement in a hospital,
> halfway house, board and care facility, or
> other environment that provides similar
> structure. . . . Such settings may greatly
> reduce the mental demands placed on you. With
> lowered mental demands, overt symptoms and
> signs of the underlying mental disorder may be
> minimized. At the same time, however, your
> ability to function outside of such a
> structured or supportive setting may not have
> changed. If your symptomatology is controlled
> or attenuated by psychosocial factors, we must
> consider your ability to function outside of
> such highly structured settings.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(F).

The ALJ here wholly failed to acknowledge the highly structured setting within which plaintiff functioned during his limited period of improvement. Such failure detracts from the ALJ's determination to discount the opinions of plaintiff's treating psychiatrists who not only were well aware of plaintiff's structured setting, but indeed partnered with such setting by working and coordinating with plaintiff's case manager. Collectively, Drs. Houghton and Gangure treated plaintiff on no

less than nineteen occasions over a two-year period. For the ALJ
to discount the opinions of these treating psychiatrists on the
basis of a four-month limited period of improvement, during which
plaintiff functioned within a structured setting, was error.

The ALJ also determined to discount the March 2008 and
June 2009 opinions rendered by Drs. Houghton and Gangure,
respectively, on account of the GAF scores assigned therein. In
her March 2008 MMSS, Dr. Houghton assigned plaintiff a GAF score of
55; in June 2009, Dr. Gangure assigned a GAF score of 52. Both
scores indicate moderate symptoms of mental illness or moderate
impairments in social or occupational functioning. While an ALJ is
not compelled to give *controlling* weight to a treating
psychiatrist's opinion that a claimant suffers extreme limitations
where such opinion is "starkly inconsistent" with his finding that
the claimant's GAF score indicates only moderate symptoms, see
Goff, 421 F.3d at 791, neither should an ALJ rely solely on a GAF
score to discount the opinion outright. Cf. Jones v. Astrue, 619
F.3d 963, 973-74 (8th Cir. 2010). While the GAF system provides
insight into a claimant's overall level of functioning, it is not
a dispositive factor in and of itself and must be considered in
conjunction with other medical evidence. Id. Here, as discussed
above, the only other medical evidence upon which the ALJ relied to
discount Drs. Houghton's and Gangure's opinions consisted primarily
of plaintiff's limited improvement during a four-month period when

plaintiff lived in and was supported by a highly structured environment.

The ALJ was free not to give controlling weight to the opinions of Drs. Houghton and Gangure. A review of the ALJ's decision here, however, shows the ALJ not to have examined the various factors as required by the Regulations in determining what weight to accord the opinions, nor to have provided good reasons for the weight given these treating sources' opinions. 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasons for discounting Dr. Houghton's March 2008 MMSS and Dr. Gangure's June 2009 MMSS are not supported by substantial evidence on the record as a whole and, as such, do not constitute good reasons for according little weight to the opinions rendered therein. Upon remand, the Commissioner should review the entire record and reevaluate the weight given to the opinions of these treating psychiatrists. In the event controlling weight is not accorded to such opinions, the Commissioner must give good, legally sufficient reasons for the weight given, and such reasons must be supported by substantial evidence on the record as a whole.

2. *Opinion Evidence from Treating Psychiatrist, Dr. Cox*

The ALJ determined to accord Dr. Cox's opinion "no weight, as he [sic] does not appear to have any treating relationship with the claimant." (Tr. 16.)

At the time the ALJ rendered his written decision, the

record included Dr. Cox's MMSS completed on September 28, 2009, as well as an office notation that plaintiff missed a scheduled appointment with Dr. Cox in July 2009. Evidence of plaintiff's treatment by Dr. Cox between July and September 28, 2009, was not before the ALJ but was submitted to and considered by the Appeals Council after the ALJ's decision. Such evidence consists of treatment records which include Dr. Cox's observations that plaintiff continued to have mood episodes, continued to get depressed, continued to have auditory hallucinations, and talked to himself regularly. These treatment records also include notes from mental status examinations which showed plaintiff to be tearful and to have tangential and somewhat circumstantial flow of thought. The records also include Dr. Cox's considerations regarding a change in plaintiff's medication regimen given plaintiff's current response thereto.[17] Significantly, this evidence is consistent with the evidence obtained from plaintiff's other treating psychiatrists which was in the record before the ALJ.

As noted above, the Appeals Council considered Dr. Cox's treatment notes in determining not to review the ALJ's decision. As such, this Court is required to determine how the ALJ would have weighed this newly submitted evidence if it had been presented at the original hearing. Jenkins v. Apfel, 196 F.3d 922, 924 (8th

---

[17]The treatment records also show a GAF score of 50, which indicates serious symptoms of mental illness or serious impairments in functioning.

Cir. 1999) (citing Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994)). This requires speculation as to how the ALJ would have weighed Dr. Cox's MMSS if he had before him at the time of his decision evidence of the actual treatment relationship between Dr. Cox and plaintiff. Flynn v. Chater, 107 F.3d 617, 622 (8th Cir. 1997) (citing Riley, 18 F.3d at 622). Inasmuch as this cause shall be before an ALJ upon remand for further proceedings, the Court considers it appropriate for that ALJ to review evidence of Dr. Cox's treatment of plaintiff in the first instance and determine the appropriate weight to be accorded Dr. Cox's MMSS based upon such treatment and other evidence of record. This is especially true here, where the ALJ appeared to dismiss consideration of Dr. Cox's MMSS outright given the lack of evidence of any treatment relationship.

3.    *Opinion Evidence of Consulting, Non-Examining Physician, Dr. McGee*

Finally, the ALJ noted in his decision that he considered the opinion of the non-examining medical consultant, Dr. McGee, and, without discussion, found it to be "consistent with this decision and the record as a whole." (Tr. 16.) It thus appears that the ALJ accorded the opinion rendered in Dr. McGee's February 2008 Mental RFC Assessment greater weight than the opinions of plaintiff's treating psychiatrists rendered in MMSS's dated March 2008, June 2009 and September 2009.

Dr. McGee rendered her opinion in February 2008, twenty

months prior to plaintiff's administrative hearing. Dr. McGee did not have the benefit of reviewing any medical and/or treatment records obtained subsequent to February 2008, with such records documenting substantial treatment rendered by three treating psychiatrists as well as their opinions of plaintiff's functional limitations caused by his mental impairments; the continued fluctuation and exacerbation of plaintiff's symptoms, despite adjustments to plaintiff's medications and treatment regimen; additional diagnoses of mental impairments, including schizoaffective disorder; and the effect, if any, plaintiff's structured residential and continued care settings had on plaintiff's functional abilities. The ALJ's reliance on a dated RFC checklist completed by a non-examining consultant coupled with his corresponding failure to credit subsequent supporting evidence, including treatment notes of plaintiff's treating psychiatrists that indicate continued or exacerbated symptoms, is error and does not constitute substantial evidence upon which to find non-disability. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995) (error to rely on remote medical evidence to determine RFC; RFC must reflect what work, if any, claimant is capable of performing at time of the hearing); Morse v. Shalala, 32 F.3d 1228, 1230-31 (8th Cir. 1994) (ALJ erred by relying on old medical report and gave no weight to subsequent supporting evidence, including treating physician's progress notes that indicated continued pain

consistent with claimant's subjective complaints).

The Regulations require that more weight be given to the opinions of treating physicians than other sources. Indeed, the opinions of treating physicians are generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. Although the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources and non-examining sources, and to provide good reasons for according less than controlling weight to the opinions of treating physicians, the ALJ's explanation here regarding the weight given to each of such opinions in this case is less than adequate and is not supported by substantial evidence on the record as a whole.

B. Credibility Determination

Plaintiff claims that the ALJ erred in determining his subjective complaints not to be credible.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v.

<u>Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need not explicitly discuss each <u>Polaski</u> factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. <u>Wildman v. Astrue</u>, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. <u>Id.</u> at 738; <u>see also</u> <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, the decision should be upheld. <u>Hogan</u>, 239 F.3d at 962. The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005); <u>Pearsall</u>, 274 F.3d at 1218.

In determining plaintiff's credibility in the instant cause, the ALJ first noted that the record failed to establish that

plaintiff's diagnosed condition of diabetes mellitus would preclude plaintiff from working inasmuch as there was no evidence of hospitalizations or complications resulting from such impairment. While a lack of objective medical evidence supporting disabling symptoms may constitute a basis upon which to discredit a claimant's subjective complaints thereof, the Court notes that the plaintiff here clarified at the administrative hearing that he sought disability benefits on the basis of his mental impairment alone. Plaintiff made no subjective complaints regarding his diabetes nor testified that he was disabled on account of the impairment. The lack of objective evidence of disabling symptoms arising from diabetes should therefore not be a basis upon which to find plaintiff not to be credible.

The ALJ also determined, however, to discount plaintiff's subjective complaints relating to his mental impairment. In discrediting plaintiff's complaints, the ALJ specifically found, first, that plaintiff had received only intermittent treatment for mental health concerns. (Tr. 15.) This finding is not supported by, and indeed is contrary to, substantial evidence on the record as a whole. Evidence before the ALJ at the time of his decision shows that between April 2006 and June 2009, plaintiff sought out and received psychiatric treatment on no less than thirty separate occasions. Such occasions included scheduled appointments with psychiatrists, psychiatric evaluations and assessments, and

hospitalizations. Indeed, during plaintiff's first documented hospitalization in April 2006, Dr. Krojanker noted plaintiff to be, at that time, a psychiatric patient at Hopewell Clinic. In addition, records not before the ALJ at the time of his decision show plaintiff to have continued to seek and obtain psychiatric treatment subsequent to June 2009, with such treatment including an additional assessment at BJC Behavioral Health and appointments thereafter with Dr. Cox. Seeking and receiving treatment for mental impairments on at least thirty separate occasions within a thirty-eight month period, continuing up to the time of the administrative hearing in this cause, cannot be considered "intermittent" treatment for such impairments. Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than he claims is undermined. Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996).

In addition, the ALJ found that plaintiff's impairment was responsive to treatment when plaintiff was compliant with his medication regimen. (Tr. 15.) This finding is not supported by substantial evidence on the record a whole. Although evidence shows plaintiff's condition to have deteriorated when he ran out of medications or was not taking his medications as prescribed, substantial evidence nevertheless shows that, even when compliant

with medication, plaintiff continued to suffer from and exhibit significant symptoms of his mental impairments. Indeed, subsequent to plaintiff's cessation of alcohol and drug use, Dr. Houghton repeatedly noted plaintiff to be compliant with his medication and treatment regimen but that he nevertheless continued to exhibit symptoms of low mood, crying spells, thoughts of death, depression, vivid dreams, fatigue, excessive worrying, and periodic hallucinations. During his subsequent treatment with Dr. Gangure, plaintiff continued with symptoms of mood swings, irritability, insomnia, and hallucinations. Throughout this period, plaintiff's mental condition was continually monitored and plaintiff was provided with multiple prescriptions of psychotropic medications with continued adjustment of dosages given his transient response to such treatment. The numerous treatment notes in the record show, contrary to the ALJ's finding, that plaintiff's condition did not improve with medication and therapy and, indeed, plaintiff continued to exhibit symptoms, including auditory hallucinations, despite such treatment.

Further, as discussed supra at Section V.A.1, the ALJ noted that between April and July 2008, plaintiff reported that he felt "better," Dr. Houghton stated that plaintiff appeared "brighter," plaintiff exhibited independence and management of his schedule and transportation needs, and that such treatment notes "[did] not portray an individual who would be unable to work due to

mental health-related symptoms." (Tr. 16.) The ALJ's reliance on treatment notes made within a four-month snapshot to discredit plaintiff's complaints of chronic mental illness was error. This is especially true where, as discussed above, the ALJ failed to consider the structured setting within which plaintiff operated during this time, and ignored the longitudinal evidence of plaintiff's mental impairments.

The ALJ also found plaintiff's daily activities of laundry, washing dishes, making the bed, vacuuming, raking leaves, and gardening to demonstrate a functional ability to engage in sustained work activity. (Tr. 16.) The "ability to perform such routine and simple daily living activities," however, "hardly seems inconsistent" with plaintiff's subjective complaints about symptoms relating to his mental functioning, i.e., memory problems, difficulty sleeping, inability to focus and follow directions, mood swings, depression, nervousness, and auditory hallucinations. Reed v. Barnhart, 399 F.3d 917, 922-23 (8th Cir. 2005).

> It is necessary from time to time to remind the [Commissioner] that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. This admonition underscores . . . the need to consider the frequency and independence of activities performed by the claimant, as well as the claimant's ability to sustain these activities over a period of time.

> . . . Since a claimant need not prove
> [he] is bedridden or completely helpless to be
> found disabled, the import of [a claimant's]
> ability to carry out daily activities must be
> assessed in the light of the record-supported
> limitations on [his] ability to perform
> real-world work.

Id. at 923-24 (internal quotation marks and citations omitted).

Finally, the ALJ determined to discredit plaintiff's subjective complaints on the basis of plaintiff's work record, finding specifically that plaintiff may be financially motivated to exaggerate his symptoms in an effort to obtain benefits given that receipt of such benefits would provide more annual income than plaintiff generally achieved through working. (Tr. 16.) As noted by the Eighth Circuit, however, "all disability claimants are financially motivated to some extent." Ramirez v. Barnhart, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002). As such, financial motivation should not be dispositive in assessing a claimant's credibility. Id. Instead, "a claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." Id. Because the other factors upon which the ALJ relied to cast doubt upon plaintiff's credibility are not supported by the record, plaintiff's possible financial motivation in seeking benefits cannot serve as a basis upon which to discredit his subjective complaints.

In light of the above, it cannot be said that the ALJ

demonstrated in his written decision that he considered all of the evidence relevant to plaintiff's complaints or that the evidence he considered so contradicted plaintiff's subjective complaints that his testimony could be discounted as not credible. <u>Masterson</u>, 363 F.3d at 738-39. Accordingly, because the ALJ's decision fails to demonstrate that he considered all of the evidence under the standards set out in <u>Polaski</u>, this cause should be remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in <u>Polaski</u>.

C. <u>RFC Assessment</u>

Where an ALJ errs in his determination to discredit a claimant's subjective complaints, the resulting RFC assessment is called into question inasmuch as it does not include all of the claimant's limitations. <u>See</u> <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 722 (8th Cir. 2001). Plaintiff also claims, however, that the ALJ's RFC determination is flawed inasmuch as the ALJ improperly based his finding on the opinion of Dr. McGee, a non-examining consultant. For the reasons stated in Section V.A, <u>supra</u>, plaintiff's argument is well taken.

A claimant's RFC is a medical question, and some medical evidence must support the ALJ's RFC determination. <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002); <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer v. Apfel</u>, 245 F.3d 700, 703-04 (8th Cir. 2001). The ALJ is "required to

consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. <u>Hutsell</u>, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. <u>Id.</u>

In this cause, the ALJ discounted the opinions of all of plaintiff's treating psychiatrists. As such, the only evidence in the record that addressed plaintiff's mental ability to function in the workplace was the Mental RFC Assessment completed by Dr. McGee in February 2008. An RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not medical evidence as to how a claimant's impairments affect his current ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment. <u>See Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000); <u>Nunn v. Heckler</u>, 732 F.2d 645, 649 (8th Cir. 1984). Because the ALJ's RFC determination here with respect to plaintiff's mental ability to perform work-related functions is not supported by some medical evidence in the record, the ALJ's determination is not supported by substantial evidence on the record as a whole and cannot stand.

Therefore, for all of the foregoing reasons, the

Commissioner's adverse decision is not based upon substantial evidence on the record as a whole and the cause should be remanded to the Commissioner for further consideration. Because the current record does not conclusively demonstrate that plaintiff is entitled to benefits, it would be inappropriate for the Court to award plaintiff such benefits at this time.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause is remanded to the Commissioner for further proceedings.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE

Dated this  _27th_  day of March, 2012.